

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-CIV-_____

In the Matter of the Arbitration Between

AMERICATEL EL SALVADOR, S.A. DE C.V.,
a Salvadorian corporation,

Petitioner,

v.

COMPAÑIA DE TELECOMUNICACIONES
DE EL SALVADOR, S.A. DE C.V.,
a Salvadorian corporation,

Respondent.

_____ /

**07-21940**

**MC -MORENO**

MAGISTRATE JUDGE
SIMONTON

### AMERICATEL EL SALVADOR,
### S.A. DE C.V.'S, PETITION FOR CONFIRMATION
### AND ENFORCEMENT OF FOREIGN ARBITRAL AWARD

## I.   THE PARTIES

1.     Petitioner Americatel El Salvador, S.A. de C.V. ("Americatel"), is a corporation organized and existing under the laws of the Republic of El Salvador, with its principal place of business in San Salvador, El Salvador.

2.     Respondent, Compañía de Telecomunicaciones de El Salvador, S.A. de C.V. ("CTE"), is a corporation organized and existing under the laws of the Republic of El Salvador, with its principal place of business in San Salvador, El Salvador.

## II.   JURISDICTION AND VENUE

3.     **Subject Matter Jurisdiction.**  This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, in that it is a civil action arising under the laws and treaties of the United States, specifically 9 U.S.C. § 203 (Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958) (the "New York Convention") and/or 9 U.S.C. §§ 203, 302 (Inter-American Convention on International Commercial Arbitration, Panama City, Panama, January 30, 1975) (the "Inter-American Convention").

4.     **Personal Jurisdiction.**  General personal jurisdiction exists over CTE pursuant to the federal long-arm statute, Federal Rule of Civil Procedure 4(k)(2), in that CTE is "not subject to the jurisdiction of the courts of general jurisdiction of any state" and the claim at issue "aris[es] under federal law"  because it is a petition to confirm an award under the treaties of the United States, specifically the New York Convention and the Inter-American Convention.  Fed. R. Civ. P. 4(k)(2); 9 U.S.C. §§ 203 and 302.  Additionally, or alternatively, specific personal jurisdiction over CTE exists pursuant to the Florida International Arbitration Act, Section 684.30, Florida Statutes.  Fla. Stat. § 684.30 (2007).[1]

5.     **Venue.**  Venue of this case is proper in this district pursuant to 28 U.S.C. § 1391 (c) and (d) in that CTE is an alien corporation and is subject to

---

[1]     Moreover, Florida has a direct nexus to this matter because during the hearings of this arbitration the Parties and the Arbitral Tribunal even agreed to hold the final closing hearing in Miami, Florida.

2

personal jurisdiction in the State of Florida at the time of commencement of this action.

### III.   FINALITY OF ARBITRATION AWARD

6.     This matter involves a final arbitral award (the "Arbitral Award") relating to a certain Interconnection Agreement for Services and Access to Other Resources dated February 6, 2003 (the "Interconnection Agreement") entered into between Americatel and CTE (collectively referred to herein as the "Parties") aimed at, among other things, routing telecommunications traffic between the Parties' networks in order to allow calls between the end users of the Parties' networks.

7.     Pursuant to the Interconnection Agreement, the Parties agreed that after the first year of validity of the Interconnection Agreement, Americatel would be able to request a certain number of E-1 ports from CTE.  An E-1 port is the telecommunications mechanism that allows and permits the telecommunications traffic to take place between the Parties.

8.     On February 6, 2004, Americatel made its first request of E-1s to CTE, as provided for in the Interconnection Agreement, but CTE denied Americatel's request.  Americatel made many other requests to CTE for the E-1s it was entitled to, but CTE continued to deny Americatel's requests, refusing to enable the E-1 ports.  As a result, Americatel's telephone traffic network became oversaturated and incapable of handling its customers' telephone traffic, which resulted in a significant loss of business that continues to this day.  Moreover, CTE's blatant disregard for its obligations, as now confirmed by the Arbitral Tribunal, was done

3

with the precise motive of strangling Americatel and ultimately running it out of business.  In short, Americatel had no choice but to seek recourse pursuant to the Interconnection Agreement's dispute resolution clause.

9.     Specifically, clause 17 of the Interconnection Agreement contained a binding arbitration clause pursuant to which disputes arising under the Interconnection Agreement were to be submitted to and resolved by binding arbitration pursuant to the International Arbitration Rules of the International Centre for Dispute Resolution ("ICDR") of the American Arbitration Association ("AAA"), administered in New York, New York.  The arbitration clause provides, among other things, as follows:

> Any other dispute, not considered in the previous points, must be submitted to mandatory Arbitration, before the American Arbitration Association (AAA) and the International Rules for Arbitration, with the following rules:  (a) the location for Arbitration will be the city of San Salvador, Republic of El Salvador, where the Arbitration sessions, the hearings and any other proceeding from the Arbitration will be held, unless the Parties designate another location; (b) the arbitration will be arbitration at law; (c) the language utilized in the arbitration will be Spanish; (d) the primary applicable legislation will be that of El Salvador; (e) the number of arbitrators will be three … and (h) the judgment or Arbitration Award will be final.

A true and correct copy of the arbitration clause (in Spanish) is attached hereto as **Exhibit 1**, and a copy of the certified English translation is attached hereto as **Exhibit 2**.

4

10.     On May 22, 2007, following the completion of multi-day arbitration hearings held in San Salvador, El Salvador; the completion of a final arbitration hearing held in Miami, Florida; the presentation of evidence by both Parties, including live fact and expert witness testimony; and the submission of final written briefs presented by each Party, the Arbitral Tribunal rendered its final written Arbitral Award in a ninety-nine page decision that fully and finally disposed of all claims and counterclaims before the Arbitral Tribunal and which are addressed in detail therein.

11.     In sum, and as set forth in the Arbitral Award, the Arbitral Tribunal held that:

(i)     CTE had breached the Interconnection Agreement between CTE and Americatel and, as a result, CTE would have to:

(a)     Enable twenty-one (21) E-1 telecommunication ports for use by Americatel within a specified timeframe;

(b)     Pay Americatel US $9,427,678 in damages for CTE's breach of the Parties' Interconnection Agreement;

(ii)    Americatel's request for the imposition of moral damages upon CTE was dismissed;

(iii)   CTE's counterclaim against Americatel was dismissed;

(iv)    The arbitrators' fees and costs, totaling US $590,780.59, would be divided equally between the Parties;

5

     (v)     The administrative expenses of the AAA, totaling US $33,180, would be divided equally between the Parties; and

     (vi)     Americatel must reimburse CTE the sum of US $8,020.06 for arbitrators' fees and costs which CTE paid in excess.

A true and correct certified copy of the Arbitral Award (in Spanish) is attached hereto as **Exhibit 3**, and a copy of the certified English translation is attached hereto as **Exhibit 4**.

     12.     On July 5, 2007, the Arbitral Tribunal issued a document entitled "Decisions on Requests for Interpretation, Clarification and Correction of Arbitration Award" (the "Clarification") in response to requests for Clarification of the Arbitral Award submitted by both CTE and Americatel.  In its Clarification, the Arbitral Tribunal clarified the following, among other things:

     (i)     Confirmed that CTE had to enable twenty-one (21) E-1 telecommunication ports for use by Americatel;

     (ii)     Clarified that CTE has to pay Americatel US $9,427,678 in damages for CTE's breach of the Parties' Interconnection Agreement;

     (ii)     Clarified that CTE would have to pay the damages to Americatel with interest set at 12%, to be calculated starting from July 1, 2006.

6

A true and correct certified copy of the Clarification (in Spanish) is attached hereto as **Exhibit 5**, and a copy of the certified English translation is attached hereto as **Exhibit 6**.

13.     The Arbitral Tribunal made clear that the Clarification fully resolved all pending matters raised by the Parties concerning the Arbitral Award and that the Arbitral Award was final. *See* ¶ 20, Clarification of Arbitral Award.

14.     Clause 17 of the Interconnection Agreement provides for the enforcement of an arbitration award and states that the arbitral awards issued by the Arbitral Tribunal are not subject to appeal. Specifically, Clause 17 of the Interconnection Agreement provides, in its pertinent part, that "the judgment or Arbitration Award will be final." Clause 17, Interconnection Agreement. The Arbitral Award and its Clarification are therefore final and not subject to appeal.

15.     Additionally, pursuant to the International Arbitration Rules (the "Rules") of the ICDR of the AAA, awards issued by Arbitral Tribunals pursuant to the Rules are "final and binding on the parties" and the parties are to "carry out any such award without delay." Art. 27(1), Rules. Accordingly, pursuant to the express language in the arbitration clause and the Rules, there are no further proceedings or motions relating to the Arbitral Award.

16.     Although the Arbitral Tribunal rendered its Arbitral Award in favor of Americatel, to date CTE has failed to voluntarily satisfy the Arbitral Award. Moreover, with each day – and hours within each day – that goes by without CTE enabling the necessary E-1 telecommunication ports to Americatel, Americatel is

7

further harmed as its network continues to be completely oversaturated and it is incapable of operating as it should, which has been CTE's strategy all along – to try and extinguish Americatel from a competitive telecommunications market in El Salvador.

17.     Notwithstanding that Americatel prevailed in the arbitration, if Americatel does not immediately receive the twenty-one (21) E-1 telecommunication ports that the Arbitral Tribunal has now confirmed Americatel has been entitled to for years, CTE will prevail nonetheless in this matter by putting Americatel out of business. In fact, pricing pressure from CTE is resulting in significant deterioration in Americatel's operating margins. Without the ability to have increased interconnection capacity, Americatel's ability to survive is threatened.

18.     As a result, Americatel has had no choice but to immediately seek the entry of a Judgment on the Arbitral Award in order for it to seek enforcement of the Arbitral Award.

## IV.    **ARGUMENT**

19.     This enforcement Petition is being brought pursuant to the Federal Arbitration Act ("FAA"), which provides that "[w]ithin three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration." 9 U.S.C. §§ 207, 302. Given that the Arbitral Award was issued on May 22, 2007, and the Clarification was issued on July 5, 2007, this enforcement Petition is timely.

8

20.     The Arbitral Award and its Clarification is an "arbitral award arising out of a legal relationship ... which is considered as commercial" and therefore falls squarely within the scope of the Inter-American Convention.[2]  *See* 9 U.S.C. §§ 202, 302.  *See also Four Seasons Hotels and Resorts, B.V. v Consorcio Barr, S.A.*, 267 F. Supp. 2d, 1335, 1343 (S.D. Fla. 2003), *abrogated on other grounds* by Four Seasons Hotel & Resorts, B.V. v. Consorcio Barr, S.A., 377 F.3d 1164 (11th Cir. 2004) (the goal of the New York Convention [whose relevant provisions are substantively similar to the Inter-American Convention's provisions] is to encourage the recognition and enforcement of commercial arbitration agreements in international contracts); *Productos Mercantiles e Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41 (2nd Cir. 1994) (Inter-American Convention gives district courts jurisdiction to confirm arbitral awards rendered in foreign countries that are signatories to the Inter-American Convention).

21.     Article 4 of the Inter-American Convention provides as follows:

> An arbitral decision or award that is not appealable under the applicable law or procedural rules shall have the force of a final judicial judgment.  Its execution or recognition may be ordered in the same manner as that of decisions

---

[2]      Section 305 of the FAA provides that when the requirements for application of both the Inter-American Convention and the New York Convention are met, determination as to which Convention applies shall be made as follows:  (1) if a majority of the parties to the arbitration agreement are citizens of a State which has ratified the Inter-American Convention *and* are member States of the Organization of American States ("OEA"), then the Inter-American Convention shall apply; (2) in all other cases the New York Convention shall apply.  See 9 U.S.C.A. § 305.  Here, since both Americatel and CTE are Salvadorian citizens, and El Salvador is both a signatory to the Inter-American Convention and a member of the OEA, the Inter-American Convention applies when seeking enforcement of the Arbitral Award.
*See* http://www.sice.oas.org/dispute/comarb/intl_conv/caicpae.asp;
http://www.oas.org/documents/spa/memberstates.asp?sCode=ELS.

> handed down by national or foreign ordinary courts, in
> accordance with the procedural laws of the country where
> it is to be executed and the provisions of international
> treaties.

Art. 4, Inter-American Convention.

22.   Given that pursuant to the Parties' Interconnection Agreement the Arbitral Award and its Clarification are final and not subject to appeal, they have the force of a final judicial judgment and should be confirmed. *See id.*

23.   Under the plain language of the Inter-American Convention and the FAA, a district court's role in reviewing a foreign arbitral award is strictly limited: "The court *shall* confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. §§ 207, 302. *See Four Seasons*, 267 F. Supp. 2d at 1342. In other words, pursuant to Section 207 of the FAA and Article 5 of the Inter-American Convention, a court *must* recognize or enforce an arbitral award under the Inter-American Convention unless one of seven specifically-enumerated grounds are present.[3] *See* 9 U.S.C. § 207, 302; Art. 5, Inter-American Convention.

---

[3]   As enumerated in the Inter-American Convention, a court may refuse to confirm and enforce an arbitral award only after finding proof of one of the following seven grounds: (i) the parties are under some incapacity with respect to the applicable arbitration agreement, or the agreement is otherwise invalid; (ii) the party against whom the award is invoked was not given proper notice of the arbitration or appointment of an arbitrator or was otherwise unable to present its case; (iii) the award exceeds the scope of the terms of the submission to arbitration; (iv) the composition of the arbitral authority or the arbitral procedure was not in accordance with the parties' agreement; (v) the award has not yet become binding on the parties; (vi) the subject matter of the award is not capable of settlement by arbitration under the law of the court where confirmation and enforcement are sought; or (vii) the confirmation or enforcement of the award would be contrary to public policy. *See* Art. 5, Inter-American Convention.

HOGAN & HARTSON L.L.P., 1111 BRICKELL AVENUE, SUITE 1900 • MIAMI, FL 33131 • TEL. (305) 459-6500 • FAX (305) 459-6550

24.     In light of the Inter-American Convention's "general pro-enforcement bias," the party opposing confirmation or enforcement of an arbitral award bears the burden of proving the existence of one of these enumerated grounds. *See Four Seasons*, 267 F. Supp. 2d at 1343. *See also In the Matter of the Arbitration Between Trans Chemical Ltd.*, 978 F. Supp. 266, 304 (S.D. Tx 1997). Because none of the seven grounds are applicable to this matter, the Court should confirm the Arbitral Award and its Clarification in all respects so Americatel may seek enforcement of the Arbitral Award and immediately receive the twenty-one (21) telecommunication ports it is entitled to receive.

## V.     RELIEF REQUESTED

Based on the allegations set forth, Petitioner Americatel respectfully requests that:

1.     This Court enter an order confirming the Arbitral Award pursuant to 9 U.S.C. §§ 207 and 302 and the Inter-American Convention;

2.     This Court enter an order confirming the Clarification of the Arbitral Award pursuant to 9 U.S.C. §§ 207 and 302 and the Inter-American Convention;

3.     This Court enter a judgment that conforms to the Arbitral Award and its Clarification; and

4.     Petitioner be awarded any and all further relief that the Court deems just and proper.

11

Dated:    July 27, 2007

By:_____
          Daniel E. González
          Fla. Bar No. 780030
          degonzalez@hhlaw.com
          Richard C. Lorenzo
          Florida Bar No. 071412
          rlorenzo@hhlaw.com
          HOGAN & HARTSON L.L.P.
          1111 Brickell Avenue, Suite 1900
          Miami, Florida 33131
          Tel. (305) 459-6500
          Fax. (305) 459-6550
          *Attorneys for Petitioner Americatel El*
          *Salvador, S.A. de C.V.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via Federal Express on July 27, 2007, to **Angel Castillo, Jr.**, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Brickell Bayview Centre, 80 Southwest 8th Street, Suite 1830, Miami, FL 33130, **Salvador Enrique Anaya**, ANAYA SJE, S.A. de C.V., Boulevard Los Héroes, Condominio Los Héroes, local 9-D, San Salvador, El Salvador; and **Rosa María Machón Orellana**, Compañía de Telecomunicaciones de El Salvador, S.A. de C.V., Complejo Ex Incatel, Edificio A, Carretera a Santa Tecla, San Salvador, El Salvador, C.A.

Daniel E. González

13

# <u>EXHIBIT 1</u>

PAPEL PARA PROTOCOLO          CUARENTA Y OCHO

      DE H.

810928

DOS COLONES

aplicar al presente contrato esas mismas condiciones en su totalidad. Lo anterior será aplicable, siempre que sea bajo condiciones técnicas, económicas y de uso similares; y, bajo situaciones jurídicas iguales. **CLÁUSULA DÉCIMA SÉPTIMA: SOLUCIÓN DE CONTROVERSIAS.** Cuando se suscite cualquier controversia relativa a la interpretación, incumplimiento, desavenencia cualquiera que fuera su naturaleza, terminación o invalidez del presente contrato, las Partes harán lo posible por llegar a una solución amigable. A tal efecto, la Parte que se considere afectada deberá remitir a la otra un pedido de solución amigable, indicando los antecedentes y las causas de la controversia, así como la solución que propone. Las Partes contarán con sesenta (60) días, contados a partir del día siguiente de la recepción del pedido de solución amigable, para intentar acordar una solución; lapso que podrá ampliarse de común acuerdo. Vencido el plazo de solución amigable o su ampliación, si no existiere acuerdo para la solución de la controversia, cualquiera de las Partes podrá acudir a la vía arbitral, conforme a las siguientes reglas: (A) si la controversia se refiere a conflictos derivados específicamente por objeciones a las que se refiere la cláusula Quinta de este contrato, o a conflictos relativos a la confidencialidad y uso de la información compartida a que se refiere la cláusula Décima Octava del mismo, aquélla deberá ser sometida, obligatoriamente, a arbitraje salvadoreño, de conformidad a la Ley de Mediación, Conciliación y Arbitraje, con las siguientes reglas: (a) el lugar del arbitraje será

la ciudad de San Salvador, en donde se llevarán a cabo las sesiones arbitrales, las audiencias y cualquier otra diligencia del arbitraje, salvo que las Partes estipulen otro lugar; (b) el arbitraje será Ad-Hoc y arbitraje en derecho; (c) el lenguaje utilizado en el arbitraje será el castellano; (d) el número de árbitros será de tres (3), cada Parte designará uno y el tercero será designado por los dos primeros; (e) los honorarios de los árbitros y los gastos derivados de la administración y tramitación del arbitraje serán cubiertos a razón del cincuenta por ciento (50%) por cada Parte; (f) los gastos, costos y honorarios de abogados y peritos serán cubiertos por cuenta de cada Parte; (g) el laudo arbitral será válido por mayoría simple; y (B) Cualquiera otra controversia, no contemplada en los supuestos anteriores, deberá ser sometida a arbitraje obligatorio, ante la Asociación Americana de Arbitraje (AAA) y sus Reglas Internacionales de Arbitraje, con las siguientes reglas: (a) el lugar del arbitraje será la ciudad de San Salvador, República de El Salvador, en donde se llevarán a cabo las sesiones arbitrales, las audiencias y cualquier otra diligencia del arbitraje, salvo que las Partes designen otro lugar; (b) el arbitraje será de derecho; (c) el lenguaje utilizado en el arbitraje será el castellano; (d) la legislación sustantiva aplicable será la salvadoreña; (e) el número de árbitros será de tres, cada Parte designará uno y el tercero será designado por la AAA; (f) los honorarios de los árbitros y los gastos derivados de la administración y tramitación del arbitraje serán cubiertos a razón

OF-K-Dirección de Servicios Gráficos



PAPEL PARA PROTOCOLO          CUARENTA Y NUEVE

M. DE H.
Nº 4810929

DOS COLONES

del cincuenta por ciento (50%) por cada Parte; (g) los gastos, costos y honorarios de abogados y peritos serán cubiertos por cuenta de cada Parte y (h) el fallo o laudo arbitral será definitivo. Cuando como parte de una controversia relativa a interpretación, incumplimiento, desavenencia cualquiera que fuera su naturaleza, terminación o invalidez del presente contrato, se reclame indemnización de daños y perjuicios de cualquier tipo o naturaleza, pudiendo referirse pero sin limitarse a daños especiales, directos, incidentales, punitivos, consecuenciales, u otros, los mismos se limitarán a un monto máximo a determinarse de la siguiente manera: 1) para los servicios que se originen en la red de la Parte demandada será de veinticuatro (24) veces la facturación mensual de los servicios afectados que la Parte demandante efectuó a sus clientes; 2) para los servicios de terminación de tráfico en la red de la Parte demandada será igual a veinticuatro (24) veces la facturación mensual de los servicios afectados que la Parte demandada realiza a la parte demandante. Para efectos de la determinación de la facturación mensual mencionada en los numerales 1) y 2) anteriores, se tomará como base el monto promedio de los últimos tres (3) meses de la facturación de los servicios afectados previos a la fecha en que dichos servicios fueron afectados. Adicionalmente, la Parte demandante en ningún caso podrá exigir una indemnización en concepto de daños morales. CLAUSULA DECIMA OCTAVA: CONFIDENCIALIDAD Y USO DE LA INFORMACION COMPARTIDA. a) Cualquier información que una Parte reciba de la otra durante la

# EXHIBIT 2

# Language Innovations, LLC™

*Helping businesses communicate worldwide™*

1725 I Street, NW
Suite 300
Washington, D.C. 20006

tel       202  349 4180
fax       202  349 4182
email:  translate@languageinnovations.com

## TRANSLATION CERTIFICATION

This is to certify that the translation of the attached document(s), Ref.: **Americatel Arbitral Clause**, is to the best of our knowledge and ability, a true and accurate translation of the original text delivered to Language Innovations, LLC by our client, Hogan & Hartson LLP. The original document was translated from Spanish into English and at completion delivered to the client on July 25, 2007.

I hereby declare that all statements made herein are of my own knowledge and are true and that all statements made based on information or belief are believed to be true.

Language Innovations, LLC hereby agrees to keep the content of this translation confidential according to ethical and legal standards of the profession of Translation. Language Innovations, LLC agrees not to discuss, evaluate, distribute or reproduce any material included in or related to the translation of this document.

Date: _July 25, 2007_

Signature: _____
Brian Friedman, Director
Language Innovations, LLC

Subscribed and sworn before me this __25th__ day of __July__ 20 _07_, at Washington, DC.

_____
Notary Public

JAMES M. REED
My Commission Notary Public District of Columbia
My Commission Expires: June 30, 2007

[Round Notarial Seal Appears- FRANCISO JOSE BARRIENTOS- NOTARY PUBLIC REPUBLIC OF EL SALVADOR]

PROTOCOL PAPER

FORTY EIGHT

**M DE H**
4810928



[ROUND STAMP APPEARS-SUPREME COURT OF JUSTICE, NOTARIAL SECTION, REPUBLIC OF EL SALVADOR, CENTRAL AMERICA]

[ROUND SEAL APPEARS]
REPUBLIC OF EL SALVADOR IN CENTRAL AMERICA
TWO COLONES

[cut off text] apply to the contract those same conditions in their entirety.

The previous will be applicable when it is used under similar technical, economic and use conditions and under equal legal situations. **CLAUSE SEVENTEEN: DISPUTE RESOLUTION.** Whenever any dispute is raised relating to the interpretation, non-fulfillment, disagreement, whatever the nature may be, termination or invalidity of the present contract, the Parties will do everything in their power to arrive at an amicable solution. To such effect, the party that is considered to be affected must submit to the other party a request for an amicable solution, indicating the background and the causes for the dispute, as well as the solution that they propose. The parties will have sixty (60) days, starting from the day following the receipt of the request for amicable solution, in order to attempt to reach a solution; time period that may be extended by mutual agreement. Upon expiration of the allotted time period to reach an amicable solution or the allowed extension, if there is no agreement for solving the dispute, either of the parties may resort to Arbitration pursuant to the following rules: (A) if the dispute deals with conflicts derived specifically from objections that are addressed in the Fifth Clause of this contract, or to conflicts relating to confidentiality and use of the shared information that is addressed in Clause Eighteen of the same, the dispute must be submitted, compulsorily, to Salvadoran Arbitration, in conformity with the Law for Mediation, Conciliation and Arbitration, with the following rules: (a) the location for Arbitration will be in the city of

San Salvador, where the Arbitration sessions, the hearings and any other proceeding from the Arbitration will take place, unless the parties stipulate another location; b) the Arbitration will be Ad-Hoc and arbitration at law, (c) the language utilized in the Arbitration will be Spanish; (d) the number of arbitrators will be three (3), each party will designate one and the third one will be designated by the first two; (e) the legal fees for the arbitrators and the expenses incurred from the administration and processing of the arbitration will be taken care of by each party covering fifty percent (50%); (f) the expenses, costs and attorney and expert fees will be covered individually by each party; (g) the Arbitration Award will be valid by a simple majority; and (B) Any other dispute, not considered in the previous points, must be submitted to mandatory Arbitration, before the American Arbitration Association (AAA) and the International Rules for Arbitration, with the following rules:  (a) the location for Arbitration will be the city of San Salvador, Republic of El Salvador, where the Arbitration sessions, the hearings and any other proceeding from the Arbitration will be held, unless the parties designate another location; (b) the arbitration will be arbitration at law; (c) the language utilized in the arbitration will be Spanish; (d) the primary applicable legislation will be that of El Salvador; (e) the number of arbitrators will be three, each party will designate one and the third one will be designated by the AAA; (f) the legal fees for the arbitrators  and the expenses incurred from  the  administration  and  processing  of  the  Arbitration  will  be  covered

[Round Notarial Seal Appears-FRANCISO JOSE BARRIENTOS-NOTARY PUBLIC REPUBLIC OF EL SALVADOR]

PROTOCOL PAPER

FORTY NINE

**M DE H**
4810929



[ROUND STAMP APPEARS-SUPREME COURT OF JUSTICE, NOTARIAL SECTION, REPUBLIC OF EL SALVADOR, CENTRAL AMERICA]

[ROUND SEAL APPEARS]
REPUBLIC OF EL SALVADOR IN CENTRAL AMERICA
TWO COLONES

in the amount of fifty percent (50%) for each Party; (g) the expenses, costs and attorney and expert fees will be covered by each party and (h) the judgment or Arbitration Award will be final.   When as part of a dispute relating to interpretation, non-fulfillment, a disagreement whatever the nature may be, termination or invalidity of the present contract, indemnity for damages and losses of any type or nature, being able to allude to but not being limited to special, direct, incidental, punitive, consequential, or other damages, the same will be limited to a maximum amount to be determined in the following manner: 1) for services that originate in the respondent's network, it will be twenty four (24) times the monthly invoicing for services performed that the petitioner made to his clients; 2) for the services of completion of traffic in the respondent's network it will be equal to twenty four (24) times the monthly invoicing for the services provided by the Respondent to the Petitioner.   To determine the monthly invoicing referred to in numbers 1) and 2) previously, the average invoiced amount of the last three (3) months for the services affected prior to the date in which said services were affected will be taken as the baseline. Additionally, under no circumstances will the Petitioner be able to demand compensation for moral damages.   **CLAUSE EIGHTEEN: CONFIDENTIALITY AND USE OF THE SHARED INFORMATION.**   a) Any information that a Party receives from the other during the [text ends]

# EXHIBIT 3

# 𝕬𝖕𝖔𝖘𝖙𝖎𝖑𝖑𝖊

(Convention de La Haye du 5 Octobre 1961)

1.   Country:   **United States of America**

     This public document

2.   has been signed by **Nancy T. Sunshine**

3.   acting in the capacity of **County Clerk**

4.   bears the seal/stamp of the county of **Kings**

# 𝕮𝖊𝖗𝖙𝖎𝖋𝖎𝖊𝖉

5.   At New York, New York     6.   the 19th day of July 2007

7.   by Special Deputy Secretary of State, State of New York

8.   No. NYC-10270042B

9.   Seal/Stamp                    10.   Signature

James Bizzarri
Special Deputy Secretary of State

04135595.RSL ( REV: 2/6/96)

 **International Centre for Dispute Resolution**

Thomas Ventrone
Vice President

1633 Broadway, 10th Floor, New York, NY 10019
telephone: 212-484-4181 facsimile: 212-246-7274
internet: http://www.adr.org/ICDR

# CERTIFICACIÓN

En referencia al caso de arbitraje:

Re: 50 181 T 00188 05
    Americatel El Salvador, S.A. de C.V.
    vs
    Compania de Telecomunicaciones de El Salvador S.A.
    C.V.

**Estado de Nueva York**
                **SS:**
**Ciudad de Nueva York**

Thomas Ventrone, habiendo sido debidamente juramentado certifica lo siguiente:

1.   Soy el vicepresidente del Centro Internacional para la Resolución de Disputas de la Asociación Americana de Arbitraje (en adelante a ser referida como "Asociación") sin fines de lucro, de carácter educativo, siendo una Asociación constituida según las leyes del Estado de Nueva York, teniendo su sede principal en las oficinas de 1633 Broadway, Nueva York, Nueva York, 10019.

2.   Estoy a cargo de todos los arbitrajes internacionales que se llevan en este centro conforme a las Reglas del Procedimiento de la Asociación y su Centro de Resolución de Disputas.  Una copia de dichas reglas se adjunta.

3.   He revisado el archivo de la Asociación con relación al caso de arbitraje de la referencia, previamente administrado por la Asociación, con el número de caso 50 181 T 00188 05.

4.   Certifico que los siguientes documentos, listados e incluidos, son copias exactas de los documentos que se encuentran en dicho expediente número 50 181 T 00188 05:

   (a) El Laudo firmado por los Árbitros Leonel Pérez Nieto, Horacio Grigera Naon y José Eloy Anzola con fecha de 22 de mayo de 2007.

   (b) Decisiones sobre Solicitudes de Interpretación, Aclaración y Corrección de Laudo firmado por los Árbitros Leonel Pérez Nieto, Horacio Grigera Naon y José Eloy Anzola con fecha de 5 de julio de 2007.

*A Division of the American Arbitration Association*

5.  Certifico que el proceso de arbitraje fue gobernado por las Reglas de Arbitraje Internacional de la Asociación, cuya entrada en vigencia y última enmienda se efectuó el día 1 de julio de 2003.

DATE:  7/17/07

_Thomas Ventrone_
Thomas Ventrone

State of  New York

County of  New York

}  SS:

On this 17th day of July, 2007 before me personally came and appeared Thomas Ventrone, to me known

instrument and

7/17
Dated

State of New York }  ss:
County of Kings  }

11921                                  Form 1

I, NANCY T. SUNSHINE, Clerk of the County of Kings, and also Clerk of the Supreme Court for the said County, the same being a Court of Record, having a seal, DO HEREBY CERTIFY, That _____ whose name is subscribed to the deposition, certificate of acknowledgment or proof of the annexed instrument, was at the time taking the same a NOTARY PUBLIC in and for the State of New York, duly commissioned and sworn and qualified to act as such throughout the State of New York; that pursuant to law a commission, or a certificate of his appointment and qualifications, and his autograph signature, have been filed in my office; that as such Notary Public he was duly authorized by the laws of the State of New York to administer oaths and affirmations, to receive and certify the acknowledgment or proof of deeds, mortgages, powers of attorney and other written instruments for lands, tenements and hereditaments to be read in evidence or recorded in this State; to protest notes and to take and certify affidavits and depositions; and that I am well acquainted with the handwriting of such Notary Public, or have compared the signature on the annexed instrument with his autograph signature deposited in my office, and believe that the signature is genuine.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the said Court and County this

JUL 19 2007

_Clerk_

## CENTRO INTERNACIONAL PARA LA RESOLUCION DE DISPUTAS

Tribunal Arbitral Internacional

---

**Resolución de Arbitraje entre:**
**Americatel EL Salvador S.A. DE C.V** Demandante
**contra**
**Compañía de Telecomunicaciones de El Salvador, S.A.** Demandada
*Caso 50-181-T-00188-05*

---

### *LAUDO ARBITRAL*

LOS ARBITROS ABAJO FIRMANTES, designados conforme al acuerdo de arbitraje firmado por las Partes en este caso y fechado **6 de febrero de 2003**, debidamente juramentados, y habiendo considerado las pruebas y las alegaciones de las Partes, publican en el presente documento, el LAUDO FINAL, a saber:

### Capítulo I
### Identificación y Representación de las Partes

#### A. Demandante y Reconvenida

1.     **AMERICATEL EL SALVADOR, S.A. DE C.V.**, en lo sucesivo denominada AMERICATEL o la demandante, o la demandante-reconvenida, o la reconvenida, con domicilio en Calle Nueva 1, número 3826, Colonia Escalón, San Salvador, El Salvador, C.A., teléfono (503) 2266-0158, fax (503) 2266-0184,

Representada por:

2.     Mario Enrique Sáenz y Humberto Sáenz Marinero, Sáenz & Asociados, Boulevard del Hipódromo, Pasaje 11 No. 85, Col. San Benito, San Salvador, El Salvador, C.A., teléfono (503) 2265-2055, fax (503) 2265-2054, correos electrónicos: mes@saenzlaw.com y hsaenz@saenzlaw.com

3.     Francisco José Barrientos, FJB, S.A. de C.V., Calle Cuscatlán, número 133, entre 81 y 83 avenida sur, Colonia Escalón, Sal Salvador, El Salvador, C.A., teléfono (503) 2263-8250, fax (503) 2263-8254, correo electrónico: lawesfjb@mundo123.com.sv

4.     Daniel E. González, Esq. y Richard C. Lorenzo, Hogan & Hartson L.L.P., Mellon Financial Center, 1111 Brickell Avenue, Suite 1900, Miami, Florida 33131, Estados Unidos de América, teléfono 1 305 459 6500, fax 1 305 459 6550, correos electrónicos: DEGonzalez@hhlaw.com y RLorenzo@hhlaw.com

**B.   Demandada y Reconviniente**

5.   **COMPAÑÍA DE TELECOMUNICACIONES DE EL SALVADOR, S.A. DE C.V.**, en lo sucesivo CTE, o la demandada, o la demandada-reconviniente, o la reconviniente, con domicilio en Complejo Ex Incatel, Edificio A, Carretera a Santa Tecla, San Salvador, El Salvador, C.A., teléfono (503) 2271-7132, fax (503) 2271-7140,

Representada por:

6.   Rosa María Machón Orellana, Compañía de Telecomunicaciones de El Salvador, S.A. de C.V., Complejo Ex Incatel, Edificio A, Carretera a Santa Tecla, San Salvador, El Salvador, C.A. Teléfono (503) 2271-7132, fax (503) 2271-7140, correo electrónico: machon.rosa@telecom.com.sv

7.   Angel Castillo, Jr., Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Brickell Bayview Centre, 80 Southwest 8th Street, Suite 1830, Miami, Florida 33130, Estados Unidos de América, teléfono 1 305 374 0506 (extensión 231), directo 1 305 374 2361, fax 1 305 374 0456. Correo electrónico Angel.Castillo@ogletreedeakins.com

8.   Salvador Enrique Anaya, ANAYA SJE, S.A. de C.V., Boulevard Los Héroes, Condominio Los Héroes, local 9-D, San Salvador, El Salvador. Teléfonos (503)2226-2033 y (503) 2226-2034, Fax (503) 2226-2035. Correo electrónico: salvador.anaya@turbonett.com

### Capítulo II
### El Tribunal Arbitral

9.   La parte demandante en su escrito de demanda propuso como árbitro al Dr. Horacio A. Grigera Naón, quien fue ratificado por el ICDR el 17 de agosto del 2005. Su domicilio es 2708 35th Place, N.W. Washington, D.C. 20007, Estados Unidos de América, teléfono 1 202 337 1832, fax 1 202 3371816, correo electrónico: hgrigeranaon@yahoo.com y hgrigeranaon@verizon.net

10.   La parte demandada en su escrito de contestación propuso como árbitro al doctor Leonel Pereznieto, quien fue ratificado por el ICDR el 17 de agosto de 2005. Su domicilio es: Insurgentes Sur # 1766, Colonia Florida, Delegación Álvaro Obregón, Ciudad de México, Código Postal 01030. Teléfono: 55 5662-0684, Fax: 55 5661-6157, correo electrónico: lpereznieto@bdavalos.com.mx

11.   Los dos árbitros así designados propusieron al abogado José Eloy Anzola como Presidente del Tribunal Arbitral, quien fue nombrado por el ICDR 30 de septiembre de 2005. Su domicilio es: No. 14, Séptima Avenida (entre 8ª y 9ª Transversal), Altamira, Caracas 1060, Venezuela. Teléfono: 58 212 263 8441, Fax: 1 954 252 4195, correo electrónico: jeanzola@gmail.com y jeloyanzola@yahoo.com

**Capítulo III**
**La Demanda presentada por AMERICATEL. Sus Memoriales del 28 de febrero de 2006,**
**22 de mayo de 2006 y 14 de julio de 2006**

11.     Este proceso se inició por demanda presentada por AMERICATEL contenida en escrito de fecha 6 de mayo de 2005 el cual fue recibido por la ICDR el día 10 de mayo de 2005.

12.     En esa demanda, y también en el Memorial que AMERICATEL fechó y presentó el 28 de febrero de 2006, ambos acompañados de probanzas documentales, AMERICATEL planteó los hechos de la siguiente manera:

**A.     Contrato de Interconexión**

13.     Expresó AMERICATEL que las partes suscribieron el día 6 de febrero de 2003, el actual y vigente Contrato de Servicio de Interconexión y de Acceso a Otros Recursos (en lo sucesivo denominado el Contrato de Interconexión). Dentro de la negociación efectuada, las partes acordaron modificar el monto de la garantía que AMERICATEL otorgaría a CTE para garantizar el cumplimiento de las obligaciones derivadas del Contrato de Interconexión y es así, como en esa misma fecha, esto es, el 6 de febrero de 2003, se firmó una modificación al "Contrato de Interconexión". El Contrato de Interconexión, había sido precedido de un contrato de interconexión de fecha 4 de noviembre de 1997, celebrado por la sociedad Industrias Telepuerto Salvadoreño, S.A. de C.V. (en lo sucesivo, TELEPUERTO)– luego convertida en AMERICATEL– y AMTEL –después de la privatización y un cambio de accionistas– convertida de esta forma en CTE.

14.     A criterio de AMERICATEL, CTE pretendía consignar en el nuevo Contrato de Interconexión, un mecanismo de habilitación de puertos E1 que ocasionara que el otro operador (en este caso AMERICATEL) tuviera un techo en su crecimiento. Por el contrario, AMERICATEL con el nuevo contrato pretendió tener un modo seguro e incontestable para la habilitación de nuevos puertos E1 que garantizaran su expansión.

15.     Señaló AMERICATEL que el Contrato de Interconexión fue inscrito en el registro público de SIGET por AMERICATEL que lo presentó, con su modificación, el día 17 de febrero de 2003.

16.     Indicó AMERICATEL que días después de suscrito el Contrato de Interconexión con CTE, concretamente el día 27 de febrero de 2003, AMERICATEL suscribió un contrato de interconexión con un operador de telecomunicaciones de red móvil denominado DIGICEL S.A. de C.V. (en lo sucesivo, DIGICEL), que para entonces recién ingresaba al mercado salvadoreño. Este contrato fue remitido el día 7 de marzo de 2003 por AMERICATEL a SIGET, a fin de que éste fuera inscrito en el registro correspondiente y adquiriese carácter público.

17.     Indicó AMERICATEL que había aceptado limitar su crecimiento al aceptar una habilitación limitada de puertos de interconexión, pero también es cierto que había logrado acordar en el Contrato de Interconexión un mecanismo de asignación de puertos de interconexión que le aseguraba que tendría las herramientas necesarias para un crecimiento controlado. A los miembros del Directorio de AMERICATEL se les hizo ver el "éxito" de lo

negociado con CTE y se les expuso cómo –con el nuevo Contrato de Interconexión– lograrían alcanzarse metas si bien conservadoras, satisfactorias para AMERICATEL.

18.     AMERICATEL expresó que le causó desconcierto y malestar que apenas transcurridos tres meses desde la entrada en vigencia del Contrato de Interconexión, puntualmente el día 8 de mayo de 2003, se presentara el representante y principal negociador de CTE a las oficinas de AMERICATEL, alegando que AMERICATEL estaba discriminando a CTE por haber firmado un contrato de interconexión con DIGICEL, y por contener éste último contrato condiciones más ventajosas para DIGICEL que las otorgadas a CTE.

19.     Señaló AMERICATEL que le hizo ver a CTE que la cláusula de no discriminación acordada por las partes y plasmada en el Contrato de Interconexión, no podía ser aplicada ya que no concurrían los supuestos que dicha cláusula establecía. En efecto, para AMERICATEL, la cláusula décimo sexta del Contrato de Interconexión suscrito establece que la posibilidad de invocar la cláusula existe *siempre que sea bajo condiciones técnicas, económicas y de uso similares; y, bajo situaciones jurídicas iguales.* A criterio de AMERICATEL el solo hecho de que DIGICEL fuera un operador de red móvil y que CTE fuera un operador de red fija, conlleva que sea más que evidente, que se trata de condiciones técnicas, económicas y de uso distintas. Eso fue lo que AMERICATEL contestó a CTE el día 21 de mayo de 2003.

20.     Alegó AMERICATEL que el 30 de mayo de 2003, CTE envió nueva carta a AMERICATEL, en la cual cuestionaba la base racional y objetiva utilizada por AMERICATEL para afirmar que no existía discriminación y que no había posibilidad de invocar la cláusula decimosexta del Contrato de Interconexión. Alegó AMERICATEL que sin ningún fundamento ni explicación CTE decía en esa carta que sí se cumplían todos y cada uno de los requisitos señalados por la cláusula décimo sexta del Contrato de Interconexión y que, por lo tanto, comunicaba que unilateralmente modificaría el Contrato de Interconexión. Concretamente CTE informó que a partir del 8 de mayo de 2003, aplicaría a AMERICATEL los términos y condiciones contractuales establecidos en el contrato de interconexión firmado entre AMERICATEL y DIGICEL.

21.     Señaló AMERICATEL que a principios de junio de 2003, los responsables de AMERICATEL en El Salvador tuvieron que explicar al Directorio de su principal accionista, que el Contrato de Interconexión firmado con CTE, el cual había sido descrito antes como todo un éxito, y sobre el cual se habían hecho estimaciones y proyecciones, estaba ahora en discusión puesto que CTE alegaba que el mismo era discriminatorio. Los miembros del referido Directorio compartieron el parecer de los ejecutivos de AMERICATEL, es decir, que no se cumplían con el requisito de que las condiciones técnicas, económicas y de uso fueran similares como para que se estuviera invocando la cláusula decimosexta del Contrato de Interconexión. Es así como el día 9 de junio de 2003, AMERICATEL envió otra carta a CTE haciéndole ver que no podría en forma abusiva, irracional y unilateral, introducir modificaciones al Contrato de Interconexión suscrito y que CTE debía acogerse al mecanismo de solucionar las diferencias de interpretación: arbitraje ante la Asociación Americana de Arbitraje.

22.     Señaló AMERICATEL que CTE presionó comercialmente por distintos flancos para lograr que AMERICATEL aceptara modificar el Contrato de Interconexión. Dijo AMERICATEL haber resistido y acudido a la vía arbitral para frenar las alegadas arbitrariedades

e incumplimientos de CTE. Dijo AMERICATEL que CTE: i) utilizó a su subsidiaria móvil CTE Telecom Personal (en lo sucesivo, PERSONAL) para exigir a AMERICATEL el pago de cantidades en concepto de "cargos por tiempo en el aire" que nunca habían sido pactados; ii) utilizó a su subsidiaria PERSONAL para exigirle a AMERICATEL firmar un contrato de interconexión en las mismas condiciones que las que AMERICATEL había firmado con DIGICEL cuando era conocido que la única razón por la que AMERICATEL y PERSONAL no habían suscrito ningún contrato de interconexión era porque PERSONAL no había destinado personal ni esfuerzos para ello; iii) CTE a través de su subsidiaria PERSONAL, introdujo en la interconexión un mensaje publicitario de más de 40 segundos que es escuchado por usuarios de AMERICATEL cuando intentan comunicarse con un usuario de PERSONAL; iv) facturó cantidades complementarias a AMERICATEL sin utilizar ningún procedimiento previsto por el Contrato de Interconexión; v) amenazó con no renovar contratos suscritos entre AMERICATEL y CTE a través de los cuales se prestaba el servicio de llamadas automáticas de cobro revertido, nacional e internacional.

23.     Expresó AMERICATEL que el día 2 de julio de 2003, el presidente de CTE, Ingeniero Dominique Saint-Jean comunicó al Gerente General de AMERICATEL, Ingeniero Álvaro García, que CTE quería que AMERICATEL renunciara al Contrato de Interconexión suscrito y que en lugar de dicho contrato, se suscribiera uno nuevo en idénticas condiciones a otro contrato de interconexión que CTE había firmado el día 30 de mayo de 2003 con otro operador de nombre TELECAM. Como esta petición era distinta a la que CTE había planteado en sus comunicaciones escritas, AMERICATEL se comprometió a evaluar la propuesta pues si bien sabía de la existencia del contrato celebrado entre CTE y TELECAM, no conocía las condiciones y particularidades del mismo.

24.     Indicó AMERICATEL que revisó el contrato de interconexión celebrado entre CTE y TELECAM y concluyó que dicho contrato era bastante similar al Contrato de Interconexión celebrado entre AMERICATEL y CTE y que las diferencias se resumían básicamente en cuatro elementos: i) no aparecía un mecanismo claro de asignación de puertos E1; ii) la restricciones para la cesión de los derechos del contrato eran distintas; iii) los cargos por terminación de tráfico internacional eran una décima de centavo de dólar más altos; y iv) había techos o límites de volumen para el tráfico internacional entrante. Era evidente entonces que la discriminación alegada y la supuesta intención de que AMERICATEL otorgara a CTE las mismas condiciones que se le habían otorgado a DIGICEL, no era más que una herramienta de la cual CTE se estaba valiendo para forzar una modificación al Contrato de Interconexión en los 4 puntos antes listados. Para AMERICATEL no puede haber otra explicación si se considera que fue el día 8 de mayo de 2003, que CTE por primera vez pide a AMERICATEL las condiciones del contrato celebrado entre AMERICATEL y DIGICEL, y argumenta que AMERICATEL discrimina, pero no fue sino unos días después, el 30 de mayo de 2003, que firma otro contrato de interconexión con otro operador (TELECAM) muy similar al que estaba atacando de ser discriminatorio.

25.     Indicó AMERICATEL que el día 19 de septiembre de 2003, el presidente de CTE, Ing. Dominique Saint-Jean, llamó al Gerente General de AMERICATEL para decirle que si AMERICATEL no aceptaba renunciar al Contrato de Interconexión y firmar uno nuevo igual al firmado entre CTE y TELECAM, CTE no renovaría los contratos para la prestación del servicio de llamadas automáticas de cobro revertido; dijo AMERICATEL que el presidente de

CTE llegó al extremo de decir que él tenía en ese momento las cartas comunicando tal decisión y que dependiendo de lo que AMERICATEL respondiera, él las firmaría o no. Dado que el Gerente General de AMERICATEL fue enfático en hacer ver que AMERICATEL no cedería ante ese tipo de presiones, se recibieron en AMERICATEL dos cartas fechadas el 19 de septiembre de 2003, anunciando que los contratos para la prestación del servicio de llamadas automáticas de cobro revertido, no serían prorrogados.

26.     Dijo AMERICATEL que unos días después, el 25 de septiembre de 2003, CTE aceptó que existía una diferencia de interpretación del Contrato de Interconexión y pidió iniciar la fase de solución amigable que el contrato establece como requisito previo al proceso arbitral. Ese mismo día, CTE anunció que si en 60 días contados a partir de esa fecha, no lograba solucionarse la diferencia de interpretación, recurrirían a la Asociación Americana de Arbitraje.

27.     Señaló AMERICATEL que representantes de ambas partes se reunieron varias veces. Arguyó AMERICATEL que ella hizo grandes esfuerzos por llegar a una solución amigable con CTE pero los personeros de ésta constantemente cambiaban sus criterios o introducían nuevos elementos en las mesas de negociación, y, mientras tanto, las presiones comerciales continuaban. Uno de esos nuevos elementos surgió, según AMERICATEL, el día 27 de noviembre de 2003. Alegó AMERICATEL que en esa fecha, representantes de CTE le indicaron a AMERICATEL que además de los puntos identificados como diferentes entre los contratos AMERICATEL-CTE y CTE-TELECAM, había otro punto que también debía modificarse en el contrato.

28.     Dijo AMERICATEL que la reunión del 21 de noviembre de 2003, se le pidió a AMERICATEL eliminar del Contrato de Interconexión, una cláusula que aparece en la nota aclaratoria número 1 de la Tabla B.1 del Anexo C del Contrato de Interconexión. La referida nota dice:

> *Las partes reconocen expresamente que el pago del cargo de interconexión hacia central internacional (CINCIN) antes indicado, paga la totalidad de los recursos asignados por la parte que está prestando el servicio, tanto para el establecimiento como para el mantenimiento de la llamada, <u>por lo que ninguna de las dos estará facultada a cobrar ningún tipo de cargo o sobrecargo a los usuarios finales</u> de la otra parte que haya seleccionado los servicios intermedios de larga distancia internacional de la otra parte, ya sea que la selección se haya realizado mediante marcación de un código multiportador o por presuscripción,...."* (El subrayado es de la demandante).

29.     Expresó AMERICATEL que la cláusula antes transcrita fue incluida en el Contrato de Interconexión, a su petición, por una muy mala experiencia que AMERICATEL había tenido en Guatemala con otra empresa perteneciente al grupo América Móvil y que se negoció con especial interés, precisamente porque se quería evitar que cuando América Móvil comprara CTE (lo cual ya era del conocimiento público) hiciera lo mismo que ya había hecho en Guatemala; es decir, distorsionara el mercado de llamadas internacionales cobrando *dos veces* a los usuarios y encareciendo evidentemente el servicio.

30.     Dijo AMERICATEL que volvió a sorprenderle la petición de CTE, especialmente por el hecho de que el contrato de interconexión celebrado entre CTE y TELECAM, también contenía la misma prohibición en el Anexo C y por ende se entendía que CTE no podría aplicar el doble cobro ya que lo tendría que hacer con todos los operadores incluido TELECAM. Cuando AMERICATEL hizo ver esto a CTE, y le hizo ver que también había una limitación legal para realizar semejante práctica. Los representantes de CTE contestaron que ese tema ya sabían como lo solucionarían con TELECAM. Dicho y hecho: CTE logró que TELECAM renunciara a la cláusula que establecía la prohibición al doble cobro, y es así como el día 4 de febrero de 2004, CTE y TELECAM celebraron una modificación al contrato de interconexión que ellos habían suscrito, suprimiendo la prohibición al doble cobro.

31.     Alegó AMERICATEL que esta práctica ya había sido conocida y proscrita por organismos fiscalizadores del mercado de telecomunicaciones. En efecto, la Superintendencia General del Sistema de Regulación Sectorial ("SIRESE") de Bolivia, en resolución administrativa No. 346, de fecha 10 de mayo de 2000, estableció que la empresa local (COTAS) no podía cobrar a sus abonados por el uso de la red local en las llamadas de larga distancia, porque este uso ya estaba siendo pagado por los abonados a ENTEL dentro del precio de la llamada de larga distancia, y estaba siendo retribuido por ENTEL a la empresa local mediante el pago del cargo de interconexión.

32.     Alegó AMERICATEL que así quedaba todavía más clara la intención de CTE al haber alegado que AMERICATEL la estaba discriminando. Estaban utilizando a 2 operadores (AMERICATEL y TELECAM) para poner condiciones en el mercado salvadoreño, que les garantizara mantener su dominio, que limitara el crecimiento de otros operadores y que constituyera una fuerte barrera para el acceso de nuevos competidores en el mercado de las telecomunicaciones.

33.     Alegó AMERICATEL que para CTE siempre estuvo claro que no podía invocar la cláusula décimo sexta del Contrato de Interconexión porque no se cumplían los requisitos establecidos por esa misma cláusula, la cual postula el principio de no discriminación y prevé que si luego de suscribir el Contrato de Interconexión, una de las partes suscribe un contrato similar con un tercero con mejores condiciones, debe dar esas mismas condiciones al co-contratante del Contrato de Interconexión siempre que las condiciones económicas y técnicas fueran similares; CTE sabía que se trataba de un contrato suscrito con un operador móvil, y ello implicaba tener en cuenta las diferencias que existen entre ambos tipos de redes.

34.     Indicó AMERICATEL que seguramente fue por eso que CTE nunca procedió a iniciar el procedimiento arbitral. Señaló a continuación que fue AMERICATEL quien, ante las citadas presiones comerciales de CTE y principalmente, ante la negativa de habilitar los puertos de interconexión, debió iniciar este proceso arbitral y solicitar, entre otras cosas, que el Tribunal Arbitral determine los alcances y el sentido correcto de la cláusula décimo sexta del Contrato de Interconexión.

35.     Arguye AMERICATEL que los mismos ejecutivos de CTE y de su subsidiaria móvil PERSONAL, han reconocido esta diferencia y así lo aplican en sus relaciones comerciales. Entre CTE y PERSONAL (ambas del grupo América Móvil) entienden que son redes distintas, y es así como entre ellas y frente a terceros aplican condiciones distintas.

**B.    Falta de Habilitación de Puertos de Interconexión**

36.      Indicó AMERICATEL que las interconexiones son esenciales para la transmisión de información entre diversos puntos y para que pueda haber un régimen de libre competencia en la industria de las telecomunicaciones. Arguyó AMERICATEL que es por ello que la Ley de Telecomunicaciones de El Salvador señala que las interconexiones deben establecerse de manera forzosa. En efecto, la Ley de Telecomunicaciones de El Salvador, en su Art.19, lista los que en El Salvador se conoce como "Recursos Esenciales", esto es, recursos que un operador de telecomunicaciones tiene derecho a exigir a otro operador y éste último está obligado a brindar sin poder negarse a ello, y es tal disposición la que en su literal "a" dice que uno de los recursos esenciales es "*(l)a interconexión.*"

37.      Dijo AMERICATEL que ese recurso esencial de "interconexión" a que se refiere la Ley de Telecomunicaciones, requiere, para su instrumentación y eficacia, la habilitación de puertos digitales que en la industria son conocidos como "puertos E1." Planteó la demandante que así lo señala el inciso segundo del artículo 30 del Reglamento de la Ley de Telecomunicaciones de El Salvador cuando dice: *Con el objeto de facilitar la interconexión entre redes, los operadores implementarán las interconexiones a través de puertos digitales de 2.048 Mbps, que cumplan con la recomendación G.703 de la Unión Internacional de Telecomunicaciones, salvo que acuerden algo diferente.* Y así lo confirma el Artículo 3 del mismo cuerpo normativo cuando define los puertos E1 como: *Unidades o tarjetas de un centro de conmutación que permiten la interconexión y la entrada o salida del tráfico a intercambiar.* Indicó la demandante que técnicamente se ha establecido además, que cada puerto E1 permite la realización de 30 comunicaciones telefónicas simultáneas, pudiendo en algunos casos, dependiendo de la configuración y la capacidad de una interconexión, tener hasta 31 comunicaciones telefónicas simultáneas.

38.      Señaló la demandante que sin puertos E1 no hay interconexión; sin ampliar puertos E1, no puede ampliarse la interconexión, esto es, no puede ampliarse la capacidad de cursar tráfico telefónico a través de la red de interconexión; no se puede crecer. Dijo AMERICATEL que ese ha sido el más grave de los incumplimientos de CTE al negar injustificadamente la habilitación de los puertos E1 requeridos por AMERICATEL. Señaló AMERICATEL que desde el momento en que AMERICATEL y CTE iniciaron las negociaciones para suscribir el Contrato de Interconexión, uno de los principales temas de discusión, lo constituyó la adopción de un mecanismo claro y transparente para habilitar los puertos de interconexión.

39.      Arguyó la demandante que dado que por una parte, AMERICATEL estaba muy interesada en tener ese mecanismo de asignación de puertos, pero que, por otra parte, CTE estaba interesada en que AMERICATEL mantuviera un crecimiento "controlado," se concluyó que el mejor mecanismo para hacerlo era limitando por año el número de puertos de interconexión que AMERICATEL podría solicitar a CTE. Arguyó AMERICATEL que aceptó limitar su crecimiento como contrapartida a la seguridad de recibir los puertos de interconexión.

40.      Expresó la demandante que fue así como, en el Contrato de Interconexión, en el Anexo A, numero VI, las partes acordaron lo siguiente: a) que el primer año de vigencia del

Contrato de Interconexión (2003) AMERICATEL no tendría derecho a solicitar ni obtener puertos digitales E1 adicionales a los que tenía a esa fecha; b) que a partir del segundo año de vigencia (2004 en adelante) AMERICATEL podría hacer una sola solicitud de ampliación de puertos digitales E1 por año; c) que CTE habilitaría los puertos digitales E1 que AMERICATEL le pidiera cada año, en un plazo máximo de 30 días a partir de la fecha en que hubieran sido solicitados; y d) que los puertos digitales E1 que AMERICATEL podría solicitar cada año serían como máximo el diez por ciento de los puertos digitales E1 conectados y habilitados al momento de sus respectivas solicitudes, considerando cualquier fracción resultante como entero próximo superior.

41.     Expresó la demandante que el contrato de Interconexión es claro en señalar que CTE se obliga a poner a disposición de AMERICATEL los puertos digitales E1 requeridos bajo las condiciones antes indicadas, pero adicional a este acuerdo, el numeral romano V del Anexo A, establece las condiciones técnicas que se deberían cumplir como mínimo con las capacidades o puertos digitales E1 que se habilitarían, de tal forma que ambas partes se comprometieron a realizar el *dimensionamiento* o cálculo de los recursos adicionales de manera que se garantizara una probabilidad de pérdida de tráfico no mayor del dos por ciento (2%) en las horas de máximo tráfico.

42.     Arguyó la demandante que bajo ese entendido, AMERICATEL solicitó a CTE, el día 6 de febrero de 2004, la primera ampliación de puertos de interconexión. Tomando en cuenta las limitantes pactadas entre las partes, y el hecho de que a esa fecha AMERICATEL ya tenía 58 puertos de interconexión, AMERICATEL solicitó a CTE que éste le habilitara 6 puertos E1 adicionales.

43.     Señaló AMERICATEL que a pesar de que el Contrato de Interconexión, en el Anexo A numeral VI, establecía que los puertos solicitados debían habilitarse en un plazo máximo de treinta días, y que por lo tanto se suponía que CTE habilitaría los 6 puertos E1 a más tardar el día 5 de marzo de 2004, no fue sino hasta unos días después, el 8 de marzo de 2004, que CTE respondió a AMERICATEL diciendo que no habilitaría los puertos. Las razones esgrimidas por CTE fueron, en resumen las siguientes:

a)     que había una controversia pendiente de resolución surgida por la petición que CTE había hecho para que AMERICATEL le otorgara las mismas condiciones que había pactado con DIGICEL;

b)     que aún en la eventualidad que fuere aplicable el requerimiento de AMERICATEL, CTE no estaba obligada a cumplir con tal requerimiento puesto que CTE estaba ofreciendo un porcentaje de *completación* mayor del 55%; y

c)     que el Contrato de Interconexión hablaba de número máximo de puertos a habilitar.

44.     Señaló AMERICATEL que CTE no explicó por qué una diferencia de interpretación de una cláusula del contrato, la inhabilitaría para cumplir con la habilitación de un recurso esencial; tampoco explicó cómo es que los parámetros técnicos invocados, *completación*,

se aplicaban a la petición formulada por AMERICATEL cuando las partes habían acordado un parámetro distinto (porcentaje de pérdida en hora de máximo tráfico); ni mucho menos aclaró qué quiso decir cuando menciona que los 6 puertos solicitados debían entenderse como número máximo, si de todas formas no habilitó (ni ha habilitado hasta hoy) ni un solo puerto adicional.

45.     Arguyó AMERICATEL que el día 15 de marzo de 2004, ella le hizo ver a CTE que no existía ninguna controversia pendiente de resolución que justificara la ausencia de habilitación de los puertos de interconexión. Dijo AMERICATEL que le hizo ver a CTE que el acceso a recursos esenciales ninguna relación tiene con el hecho de que CTE pretendiera que AMERICATEL le otorgara, siendo una red fija, condiciones que se habían otorgado a una red móvil. Dijo AMERICATEL que CTE no respondió, ya que ella necesitaba con urgencia los puertos requeridos, y es así como el día 15 de abril de 2004, insistió y pidió nuevamente la habilitación de los 6 puertos E1.

46.     AMERICATEL afirmó que sugirió a CTE la celebración de una reunión en la cual las partes discutieran aspectos técnicos de la interconexión y de la necesidad de los puertos, y en la cual pudieran ponerse de acuerdo sobre los mecanismos y plazos de entrega. A decir de AMERICATEL, CTE por su parte, insistió en su renuencia a cumplir con el Contrato de Interconexión, excusándose en que no se cumplían los parámetros y condiciones técnicas previstas en el Anexo Técnico del Contrato de Interconexión, manipulando por completo y a su exclusiva conveniencia lo plasmado en el Anexo Técnico. Señaló AMERICATEL que CTE misma reconocía que el tráfico de AMERICATEL había disminuido en comparación con el tráfico que se había cursado en el año 2003. Afirmó AMERICATEL que ello había ocurrido por razones imputables a CTE.

47.     Señaló AMERICATEL que se llevaron a cabo varias reuniones entre representantes de ambas partes y, en una de esas reuniones, se identificaron con claridad los puntos que a cada una de las partes le interesaba resolver. Arguyó AMERICATEL que el día 5 de mayo de 2004, AMERICATEL y CTE reconocieron que para resolver sus diferencias necesitaban implementar —entre otras cosas— lo siguiente: i) modificar el Contrato de Interconexión suscrito estableciendo límites o techos al tráfico internacional entrante; ii) disminuir un poco el cargo por terminación de tráfico internacional entrante (CINCIN) de manera tal que quedara igual al negociado entre CTE y TELECAM; iii) permitir que CTE pudiera aplicar el doble cobro al tráfico internacional saliente; y iv) habilitar a AMERICATEL los 6 E1 pendientes según el mecanismo que ambas partes reconocían que era el aplicable de acuerdo al Contrato de Interconexión.

48.     Arguyó AMERICATEL que los ejecutivos de CTE estaban conscientes que la postura que habían adoptado para no habilitar los puertos, no tenía ningún asidero fáctico, técnico ni jurídico, y que, en realidad, se trataba de una forma de presionar a AMERICATEL para modificar el Contrato de Interconexión. Señaló la demandante que así lo dijo uno de los principales ejecutivos de CTE, el Ingeniero Alberto Yanes, después de que AMERICATEL le hiciera una exposición técnica de porqué se estaban necesitando los puertos de interconexión.

49.     Arguyó AMERICATEL que las conversaciones continuaron y no dieron fruto. Se llegó así al tercer año de vigencia del Contrato de Interconexión sin que CTE hubiera habilitado un solo puerto de interconexión adicional. Arguyó AMERICATEL que comenzó a sufrir graves

daños pues no contaba con la capacidad de interconexión necesaria para continuar proporcionando a sus usuarios y clientes un servicio de calidad; no podía tampoco crecer ni por ende cumplir con sus metas y proyecciones financieras. Señaló AMERICATEL que los clientes comenzaron a perderse y el tráfico comenzó a deteriorarse por razones imputables a CTE.

50.     Señaló AMERICATEL que es así como el día 8 de febrero de 2005, haciendo uso de lo establecido en el Anexo Técnico del Contrato de Interconexión, AMERICATEL pidió otra ampliación de puertos E1. Siempre tomando en cuenta las limitaciones al número máximo al cual las partes contractualmente se habían comprometido, AMERICATEL solicitó 7 puertos E1 adicionales, con lo cual, sumados a los 6 que para entonces ya estaban pendientes, se hacían un total de 13 puertos E1 solicitados a CTE.

51.     Arguyó AMERICATEL que CTE respondió el 21 de febrero de 2005, diciendo que no cumpliría con el Contrato de Interconexión pretendiendo justificarse en lo siguiente:

> a)   que existía una controversia entre las partes pendiente de resolución, motivada por una supuesta discriminación de AMERICATEL hacia CTE;
>
> b)   que CTE estaba ofreciendo a AMERICATEL un porcentaje de *completación* superior al 55%;
>
> c)   que el solo transcurso del tiempo no habilitaba a AMERICATEL a pedir los E1; y
>
> d)   que en todo caso, el número máximo de puertos que AMERICATEL podría solicitar era de 6.

52.     Señaló AMERICATEL que ante tal respuesta, AMERICATEL le hizo saber por escrito a CTE que su negativa estaba ya ocasionando daños y que los mismos podían llegar a ser de naturaleza irreparable.

53.     Arguyó AMERICATEL que el día 14 de marzo de 2005, CTE le dijo que por el solo hecho de contar ya con interconexión física, debía sentirse satisfecha pues con eso CTE ya estaba cumpliendo sus obligaciones contractuales y legales. Dijo, además CTE que los puertos con los cuales ya contaba AMERICATEL (58 desde febrero de 2003) eran suficientes pues AMERICATEL los *subutilizaba*. Señaló AMERICATEL que tal afirmación solo podía provenir de una persona que no tuviera el más mínimo conocimiento de la industria y del *dimensionamiento* de interconexión, o de una persona cuya intención de dañar y evadir su responsabilidad fuera notoria y que AMERICATEL ya no era considerado por operadores internacionales como un operador de primera línea y, por ese motivo, había quedado relegado a desempeñar meramente el papel de operador de desborde.

54.     Señaló AMERICATEL que en la carta del 14 de marzo de 2005, CTE expresó que estaba en disposición de examinar si la petición de habilitación adicional de capacidad, cumplía o no con las condiciones establecidas en el Contrato de Interconexión. Dijo AMERICATEL que fue por ese motivo que el día 29 de marzo de 2005, AMERICATEL le hizo ver a CTE que eran completamente infundados sus argumentos de que no se necesitaban los

puertos, principalmente si se consideraba que AMERICATEL había estado remitiendo periódicamente a CTE, las estadísticas de medición de tráfico, y tales estadísticas, sin ninguna duda demostraban que existían mucho intentos de llamadas que se estaban perdiendo en horas de máximo tráfico; y que las capacidades instaladas estaban muy por debajo de las necesidades reales.

55.     Destacó AMERICATEL el hecho de que las estadísticas que AMERICATEL había enviado a CTE, coincidían conceptualmente con las estadísticas que CTE comenzó a enviar a AMERICATEL una vez iniciado el procedimiento arbitral, con lo cual, no había ninguna forma de arribar a la conclusión a la cual forzadamente pretendía llegar CTE.

56.     Señaló AMERICATEL que en mayo del año 2005, el Gerente General de AMERICATEL explicó al Gerente General al Directorio de AMERICATEL Centroamérica, que por la falta habilitación de puertos de interconexión solicitados, AMERICATEL perdió participación en el mercado de tráfico internacional, pasando de tener un 25% en el 2003 a solo un 18% en el 2004, y, además, debido a la saturación en las horas pico o de mayor tráfico, los operadores internacionales habían *enrutado* a AMERICATEL como segunda opción, ocasionando tal circunstancia, que cambiara la distribución de terminación hacia la red fija y hacia la red móvil. Arguyó AMERICATEL que esto se tradujo en que a AMERICATEL se le ocasionaron serios daños y perjuicios que se reclaman en este proceso.

57.     Arguyó AMERICATEL que siempre con fundamento en el Anexo A numeral VI del Contrato de Interconexión, el día 7 de febrero de 2006, AMERICATEL solicitó a CTE la habilitación de 8 puertos E1 adicionales, con lo cual, sumados a los requeridos en febrero de 2004 y febrero de 2005, hacen un total de 21 puertos de interconexión que han sido solicitados, pero que no han sido habilitados. El día 17 de febrero de 2006, CTE se limitó a decir que reiteraba su argumento de que AMERICATEL no necesita ni un solo puerto de interconexión adicional.

## C.   Habilitación Discriminatoria de Puertos de Interconexión

58.     Arguyó AMERICATEL que CTE había entregado capacidad de interconexión a otros operadores que le habían requerido con posterioridad, y había firmado otros contratos de interconexión comprometiéndose a seguir entregando capacidad de interconexión, y que ello demuestra la manifiesta intención de inferirle daño, lo cual en terminología legal equivale a "dolo."

59.     Arguyó AMERICATEL que no se justificaba que de manera antojadiza, arbitraria e intencional, CTE cumpliera a otros, pero no a AMERICATEL, permitiendo que otros crecieran pero no permitiéndole crecer a AMERICATEL.

60.     Arguyó AMERICATEL que CTE accedió a suscribir nuevos contratos de interconexión con otros operadores, se comprometió en esos contratos a habilitarles puertos digitales E1 a esos otros operadores y les cumplió las entregas de E1 en los términos contractualmente pactados. Afirmó AMERICATEL que tal actitud sí que constituye un incumplimiento grave a la cláusula decimosexta del Contrato de Interconexión que en lo pertinente dice: "Las partes acuerdan que los niveles de servicio, calidad, confiabilidad,

capacidad y las condiciones comerciales y económicas, se otorgan bajo el principio de no discriminación" la cual recoge el mismo principio contenido en la Ley de Telecomunicaciones salvadoreña en su Art. 20.

**D.    Consideraciones Jurídicas**

61.    Señaló AMERICATEL que el Art. 3 del Reglamento de la Ley de Telecomunicaciones de El Salvador, define el contrato de interconexión como *(e)l contrato que firman dos operadores para convenir principalmente las condiciones técnicas y comerciales de una interconexión* y que el Art. 44 del mismo Reglamento dice: *Las condiciones técnicas y comerciales específicas del servicio de interconexión serán libremente convenidas por las partes en un contrato de interconexión, en el que también se estipularán las condiciones técnicas y comerciales de los restantes recursos esenciales y obligatorios que se hayan acordado.*

62.    Para AMERICATEL lo anterior no hace sino recoger la concepción universalmente aceptada en el ámbito de las telecomunicaciones al referirse a los contratos de interconexión. En efecto, los contratos de interconexión han sido definidos como *los acuerdos en virtud de los cuales, titulares de redes acuerdan el enlace de las mismas mediante mecanismos físicos y lógicos o de software a cambio de un precio, con el fin de facilitar las comunicaciones entre los usuarios de los servicios que se prestan a través de dichas redes.*

63.    Dijo AMERICATEL que era importante definir lo que debe entenderse por interconexión; y sobre ésta dice el Art. 6 de la Ley de Telecomunicaciones de El Salvador que es: *el servicio que permite a operadores y usuarios de distintas redes cursar tráfico de telecomunicaciones de una a otra red para que todos los usuarios finales estén en condiciones de comunicarse entre sí, o para que los usuarios finales conectados a una red de servicios de acceso, estén en condiciones de obtener servicios provistos por un operador de servicios intermedios.*

64.    Señaló AMERICATEL que así lo reconocieron AMERICATEL y CTE al suscribir el Contrato de Interconexión el 6 de febrero de 2003. En ese contrato, al determinar el objeto del mismo en la cláusula segunda.

65.    Considera AMERICATEL que es preciso tomar en cuenta que los contratos de interconexión tienen ciertas características entre las cuales le interesa destacar las siguientes:

a) Por su objeto, la calidad de comerciantes sociales de los contratantes y, por la prestación masiva de los servicios contratados. El contrato se identifica como un contrato mercantil;

b) Es un contrato bilateral pues las partes que contratan se obligan recíprocamente;

c) Es un contrato oneroso pues ambos contratantes reportan utilidad del mismo;

d) Es un contrato conmutativo porque cada una de las partes se obliga a dar o hacer una cosa que se mira como equivalente de la otra; y

   e) es un contrato de tracto o ejecución sucesiva porque las obligaciones que de él
surgen se van produciendo a medida que el contrato se va cumpliendo.

**E. De la Responsabilidad Contractual**

  66. Arguyó AMERICATEL que el Código Civil de El Salvador (en adelante, CC),
regula los efectos de los contratos y de las obligaciones derivados de éstos estableciéndolos, en
los artículos 1416, 1417 y 1427.

  67. Señaló AMERICATEL que de los artículos mencionados se entiende que la
legislación sustantiva salvadoreña establece que las obligaciones deben cumplirse como han sido
pactado entre las partes, y que el cumplimiento de tales obligaciones debe hacerse de buena fe.
No cumplir, o cumplir a medias, se traduce en falta de pago y, en ese caso, la parte a quien no se
paga puede pedir la indemnización de los daños que se le han ocasionado. Así, el principal
derecho del acreedor es exigir el cumplimiento de la obligación, pactada, y en caso de
incumplimiento imputable al deudor, concurriendo los demás requisitos legales, además de
exigir el cumplimiento coactivo de la obligación, puede aquél exigir que se le indemnice por los
daños que el incumplimiento le haya causado.

  68. Afirmó AMERICATEL que eso mismo lo señala el Art. 1360 CC, el cual recoge
la denominada *condición resolutoria tácita*, pero insistió AMERICATEL que no está pidiendo la
resolución (o terminación) del Contrato de Interconexión, sino su exacto cumplimiento y la
reparación de los daños y perjuicios ocasionados directamente por los incumplimientos de CTE.

**F. De la Reparación del Daño**

  69. Dijo AMERICATEL que la responsabilidad civil deviene en la obligación de una
persona de reparar el daño, que por su culpa o dolo, ha sufrido otra.

  70. Arguyó AMERICATEL que la jurisprudencia, la doctrina y el derecho comparado
han sido unánimes en señalar que para que proceda la indemnización de perjuicios deben
cumplirse los presupuestos siguientes: i) la existencia de un contrato válido entre el autor del
daño y la víctima; ii) que el daño sea resultante del incumplimiento del contrato, es decir, que
exista entre ambos una relación de causalidad, y que el acreedor haya sufrido perjuicio a
consecuencia de tal incumplimiento; y iii) que el incumplimiento sea imputable al deudor, o sea,
que el incumplimiento sea doloso o culpable. Afirmó que los daños reparables pueden ser
patrimoniales y morales.

  71. Señaló AMERICATEL que en relación a los perjuicios patrimoniales, el Art.
1427 CC establece que la parte afectada puede exigir que se le repare tanto el daño emergente
como el lucro cesante, salvo cuando por disposición legal expresa la parte afectada sólo pueda
pedir el daño emergente. No existiendo disposición legal que limite a AMERICATEL a sólo
pedir el daño emergente, en el presente caso reclamó también el lucro cesante.

  72. Señaló AMERICATEL que el daño emergente implica un empobrecimiento del
patrimonio de una de las partes en sus valores actuales y, por otro lado, que el lucro cesante

consiste en la frustración de una ganancia o de la utilidad que haya dejado de percibir el acreedor de la obligación incumplida.

73.     Arguyó AMERICATEL que para estimar estos perjuicios el juzgador debe situarse en el día en que se sentencie; más exactamente en el día en que se pague la indemnización, pues de esa manera se repararía exacta e íntegramente.

74.     Señaló AMERICATEL que en relación con los perjuicios patrimoniales, debe tenerse en cuenta que el deudor que intencionalmente deja de ejecutar en todo o en parte la prestación debida o la ejecuta imperfectamente o tardíamente, incurre en dolo que agrava su responsabilidad por los perjuicios causados. Así lo dispone el Art. 1429 CC.

75.     Arguyó AMERICATEL que la acción u omisión cuyo autor sabía que era contrario a la ley o al contrato, es dolosa si ha sido intencional. Por lo tanto, debe definirse dolo sobre la base del elemento intencional, porque la verdadera causa del hecho doloso es la intención de inferir injuria a la persona o propiedad de otro.

76.     Indicó AMERICATEL que en relación a los perjuicios extrapatrimoniales o morales, no cabe duda que, como consecuencia de los incumplimientos al Contrato de Interconexión, se ha afectado directamente el buen nombre, la fama y el crédito de AMERICATEL. Indicó que la procedencia del reclamo se basa en el reconocimiento al daño moral que introduce el Art. 2 de la Constitución de la República de El Salvador, que establece la indemnización conforme a la ley por los daños de carácter moral. Y la legislación secundaria la reconoce en forma implícita, entre otros, en el Art.2082 del Código Civil, disposición de la cual se deduce que los daños morales o extrapatrimoniales, son susceptibles de indemnizarse.

77.     Señaló AMERICATEL como los Tribunales salvadoreños han reconocido de manera reiterada la existencia de daños morales. A esos efectos cita sentencias de tribunales salvadoreños.

78.     Arguyó AMERICATEL que la jurisprudencia ha reconocido que su valuación queda a criterio del juzgador.

79.     En ese orden de ideas, también ha sido reconocido por la doctrina y por la jurisprudencia, que los daños morales pueden ser causados no solo a personas naturales sino también a personas jurídicas.

80.     Finalmente, AMERICATEL se refirió a la parte final de la cláusula decimoséptima del Contrato de Interconexión suscrito entre AMERICATEL y CTE donde se consigna una renuncia anticipada a exigir la indemnización de daños morales. Indicó que lo anterior implicaba, para AMERICATEL, una renuncia anticipada a un derecho que aún no le había nacido por cuanto a la fecha de suscripción del Contrato de Interconexión, ninguna de las partes había resultado perjudicada moralmente.

81.     Dijo AMERICATEL que sobre las cláusulas que exoneran o limitan la responsabilidad en los contratos suscritos por las partes, cada día ha venido tomando más fuerza la jurisprudencia que ha resuelto en contra de la validez de estas cláusulas; la opinión de los

tratadistas en el sentido de no reconocer validez a las mismas, y la voluntad de los legisladores en tal sentido. Dijo que esta fuerza jurisprudencial, doctrinaria y legal, se fundamenta en el hecho de que al permitir la validez de las cláusulas aludidas importaría permitir una renuncia anticipada de derechos que desvirtuaría la esencia de los contratos y los dejaría prácticamente sin objeto. Se estaría consagrando —en contra del sistema legal— la irresponsabilidad frente a los propios incumplimientos. Con el fundamento citado tampoco es viable limitar la responsabilidad por daño, es decir, que tampoco son validas las cláusulas que establecen que el contratante incumplido responde hasta cierto límite, desde luego que la ley que enseguida se cita, por ejemplo, no hace distinción entre la limitación o exclusión de todo tipo de responsabilidad.

82.    Señaló AMERICATEL que en cuanto al criterio del orden jurídico salvadoreño sobre este particular, cabe notar el Art. 16 literal b) de la Ley de Protección al Consumidor y el literal f) del Art. 7 de la citada Ley.

83.    Arguyó AMERICATEL que sobre tal particular el máximo Tribunal Judicial de El Salvador, la Sala de lo Constitucional de la Corte Suprema de Justicia, ya se ha referido a la "renuncia anticipada de derechos" y ha expresado que "por más voluntario que haya sido, ya que nadie, ni el mismo titular, puede renunciar a sus derechos constitucionales, pues sería "desbaratar" la institucionalidad que les acompaña."

84.    Señaló AMERICATEL que los daños morales son reconocidos por la Constitución, por lo que un contrato de interconexión celebrado entre partes, por más voluntario que sea, no puede implicar la renuncia a un derecho constitucional como lo es el derecho a reclamar daños de carácter moral.

## G.    De la Interpretación de la Cláusula Décima Sexta Del Contrato de Interconexión

85.    Señaló AMERICATEL que en cualquier mercado, la transparencia y la no discriminación son consustanciales a la adecuada competencia, condiciones que deben observarse en la determinación de los precios y en la información de los mismos a los interesados, para que los actores del mercado respectivo —en este caso, el de las telecomunicaciones— tengan los elementos de juicio suficientes para adoptar sus decisiones comerciales.

86.    Afirmó AMERICATEL que si bien las empresas son libres para determinar los precios que pagan —y los criterios de fijación de los mismos— por los insumos que adquieren, tales precios y criterios deben establecerse de manera tal que no afecten el funcionamiento competitivo del mercado, ni alteren injustificadamente las relaciones entre operadores de telecomunicaciones y entre éstos y los usuarios o abonados.

87.    Indicó AMERICATEL que la anterior concepción doctrinaria no es ajena al marco regulatorio de las telecomunicaciones en El Salvador, desde luego que *como se desprende de los Considerandos de la Ley de Telecomunicaciones de El Salvador, promulgada en 1996, el pivote central de este nuevo marco regulador es la promoción de la libre iniciativa empresarial. El Estado, no obstante, mantiene su presencia y está facultado para intervenir para tutelar el interés general. Le corresponde al Estado, entre otras potestades que le quedan atribuidas,*

*garantizar la libre competencia y procurar una calidad adecuada en la prestación de los servicios.*

88.    Señaló AMERICATEL que al efecto, la Ley de Telecomunicaciones ha dicho al respecto que: *Los precios y condiciones de los servicios de telecomunicaciones entre operadores serán negociados libremente, excepto en lo que respecta al acceso a los recursos esenciales, de acuerdo a lo estipulado en la Ley; y que todo operador de redes comerciales de telecomunicaciones, deberá proporcionar acceso a recursos esenciales a cualquier operador que lo solicite mediante el pago correspondiente y sin discriminación alguna.*

89.    Señaló AMERICATEL que en esa misma línea, las partes convinieron un mecanismo contractual para preservar la no discriminación, en la cláusula décima sexta: "No Discriminación" contenida en el Contrato de Interconexión.

90.    Para AMERICATEL, sin duda alguna, el texto y, por lo tanto, el contenido y sentido de la citada cláusula es claro, y bien podría pensarse que siendo así entonces no hay habilitación del Tribunal para interpretar la cláusula; sin embargo, en el ordenamiento jurídico salvadoreño, la voluntad de las partes, su intención claramente establecida, prima sobre el tenor literal del contrato; y existiendo controversia acerca del sentido o alcance del tenor literal de un contrato acerca de la verdadera intención de ellas, habrá lugar a una labor de interpretación, independientemente del hecho de ser claro el contrato desde un punto de vista semántico. Afirmó AMERICATEL que así lo ha sostenido la jurisprudencia arbitral.

91.    Señaló AMERICATEL que el intérprete no debe conformarse con la mera literalidad de la cláusula contractual, sino examinar las circunstancias o elementos tomados en cuenta, o debidos tomar en cuenta por las partes, para la redacción de la misma, como los propósitos económicos perseguidos por la misma.

92.    Señaló AMERICATEL que es esta contienda arbitral entre las partes la única condición para que el Tribunal Arbitral pueda interpretar la cláusula decimasexta: No Discriminación del Contrato de Interconexión, en lo que respecta al punto específico invocado por CTE, respecto al contrato de AMERICATEL con DIGICEL.

93.    Afirmó AMERICATEL que el "Principio de No Discriminación" a que hace alusión la cláusula contractual comentada, es sin duda el mismo que ha recogido el Art.20 de la Ley de Telecomunicaciones, y que, en términos generales, consiste en que, por un lado, a todo operador de telecomunicaciones que solicite interconexión y que pague por ello se le dará acceso a ella; y, por otro, que dicho acceso se lleve a cabo en condiciones similares a las que otros operadores han tenido.

94.    Dijo AMERICATEL que en El Salvador, ha sido criterio pacíficamente aceptado, que lo que está prohibido es el tratamiento desigual, carente de razón suficiente, inmotivado, es decir, la diferenciación arbitraria. Para que una diferenciación de trato resulte discriminatoria, ella debe ser irrazonable. Si hay una diferencia de trato, pero la misma tiene fundamento objetivo, no existe discriminación.

95.      Afirmó AMERICATEL que ha sido criterio invariable en el mercado de las telecomunicaciones que la interconexión de redes es negociada libremente, lo cual, por cierto, así es reconocido por la Ley de Telecomunicaciones de El Salvador, en sus artículos 21(i) y 22. Esta libertad de negociación determina la posibilidad lícita que los contratos o acuerdos de interconexión no necesariamente tengan que ser idénticos. Por esta razón es que la ley, al hacer referencia implícita al principio de no discriminación utiliza los vocablos *"términos contractuales similares"* (no iguales), en el artículo 22 antes citado.

96.      Señaló AMERICATEL que, conforme a ello, la misma ley, para fomentar un mercado competitivo, reconoce la posibilidad que los acuerdos de interconexión puedan variar de un competidor a otro, sin que ello, por sí solo, signifique que se trate de acuerdos o contratos discriminatorios.

97.      Señaló AMERICATEL que en virtud de lo expuesto, sin duda alguna que el mejor entendimiento de la cláusula DECIMA SEXTA: NO DISCRIMINACIÓN, era el que suponía:

a) que el Principio de No Discriminación al que hace referencia debe entenderse en el sentido constitucional, legal y económico que se ha dejado expuesto en los párrafos precedentes;

b) que, por lo tanto, "las mejores condiciones contractuales que las establecidas en virtud del presente contrato", a que hace referencia dicha cláusula, no puede entenderse como la simple diferencia de términos y condiciones; sino que tal diferencia debe implicar, por decirlo así, una ventaja económica para el tercer operador a quien se le otorgó una condición o bien para el operador que la otorgó, pero tomando en cuenta todas las circunstancias tenidas en consideración y los resultados económicos perseguidos por las partes, y no la simple comparación aislada de cifras o términos contractuales; y

c) que, en todo caso, solo será posible su aplicación, cual la misma lo expresa, siempre que las condiciones bajo las cuales se pide su aplicación sean similares en cuando a condiciones técnicas, económicas y de uso similares; y bajo situaciones jurídicas iguales. Advirtiendo, que esta condición de aplicabilidad de la cláusula sin duda ha querido referirse, sin limitarse a ello, a condiciones técnicas, tales como la naturaleza, tamaño y funcionamiento de las redes; a condiciones económicas, como el tamaño y actividades de las empresas, su tiempo de operar y posición en el mercado; a condiciones de uso, como la cobertura, portafolio de servicios y uso de las redes por los abonados o usuarios; y a circunstancias jurídicas, como la duración de los contratos y sus modalidades de prórrogas, la naturaleza de la organización corporativa de los operadores, la legislación aplicable, limitaciones impuestas por autoridades competentes, etc.

98.     Indicó AMERICATEL que por todas las razones expuestas, ésta desde un principio ha sostenido y lo mantiene y lo reitera, que la cláusula decimasexta no era aplicable al caso planteado por CTE.

**H.   Peticiones de AMERICATEL**

99.     En virtud de todo lo que ha expuesto, AMERICATEL pidió:

a)   Que el Tribunal Arbitral ordene a CTE el fiel cumplimiento del Contrato de Servicio de Interconexión y de Acceso a Otros Recursos, celebrado con AMERICATEL el día 6 de febrero de 2003, en particular lo siguiente:

   (i)   Habilite a AMERICATEL de inmediato, los veintiún (21) puertos digitales E1 que han sido solicitados a CTE de acuerdo al Contrato de Interconexión y que se encuentran pendientes de entrega;

   (ii)  Se abstenga de discriminar a AMERICATEL en la entrega de puertos digitales E1 a otros operadores;

b)   Que el Tribunal Arbitral dirima la diferencia de interpretación existente entre las partes, específicamente en lo que respecta al sentido que debe dársele a la cláusula décima sexta, "No Discriminación" del Contrato de Interconexión, resolviendo que AMERICATEL no está obligada a otorgar a CTE las mismas condiciones comerciales que se pactaron entre AMERICATEL y DIGICEL por tratarse de condiciones técnicas, económicas y de uso diferentes;

c)   Que el Tribunal Arbitral ordene a CTE indemnizar a AMERICATEL los daños y perjuicios irrogados como consecuencia de los incumplimientos al Contrato de Interconexión; daños y perjuicios que hasta junio de 2006, han sido estimados en un monto de treinta y ocho millones trescientos treinta y nueve mil dieciséis dólares de los Estados Unidos de América (US $38.339.016,00), más los intereses legales del doce por ciento anual (destáquese que este monto en la demanda original alcanzaba la cifra de US$ 5.500.000 pero que la demandante se había reservado el derecho de reformular el monto de los daños); y

d)   Que el Tribunal Arbitral ordene a CTE indemnizar a AMERICATEL los daños morales ocasionados como consecuencia de los incumplimientos al Contrato de Interconexión; daños que deberán ser estimados por el Tribunal Arbitral.

**Capítulo IV**
**La Contestación de la Demanda Presentada por CTE. Sus Memoriales del 28 de febrero de**
**2006, 22 de mayo de 2006 y 14 de julio de 2006**

99.     El día 10 de mayo de 2005, por medio de fax remitido por los abogados de
AMERICATEL, CTE fue notificada de la demanda presentada en su contra por AMERICATEL.
Mediante escrito de fecha 29 de junio de 2005, la demandada presentó la contestación a la
demanda y a la vez planteó una reconvención.

100.     En su contestación CTE planteó que la demanda de AMERICATEL se
circunscribía, en el núcleo de la parte referente a la controversia sobre ampliación de capacidad,
por un lado, a sostener que la habilitación de puertos E1 adicionales en la ruta de interconexión
entre CTE y AMERICATEL debía concederse por CTE en forma automática, esto es, por el
mero transcurso del tiempo y a la mera petición de AMERICATEL, aunque tangencialmente
había sostenido que "no contar con la capacidad de interconexión necesaria provoca una
saturación en las redes"; y, por otro lado, señaló una serie de eventos materialmente
intrascendentes, pero que AMERICATEL presentó en forma distorsionada y en un estéril
esfuerzo de conjunción, para intentar sostener un infundado alegato sobre una estrategia de
ilegítimas presiones de CTE contra AMERICATEL para forzarla a suscribir un modificación
contractual.

101.     Sostuvo CTE que las infundadas aseveraciones de AMERICATEL sobre
interpretación y comprensión de las cláusulas contractuales relativas a la ampliación de
capacidad de manejo de tráfico, además que eran refutadas por un análisis estrictamente jurídico,
eran totalmente desvirtuadas al remontarse a los antecedentes inmediatos de la formulación del
actual texto de la estipulación contractual sobre la referida ampliación, pues ello deja en
evidencia que el propósito de las partes, claramente expresado en el contrato, es que *la
ampliación de capacidad de manejo de tráfico no procede en forma automática ni por el mero
transcurso del tiempo, sino que la misma debía estar precedida de un dimensionamiento* —en el
sentido de elaboración de una dimensión, que en este caso correspondía a la determinación del
número de puertos E1 adicionales que habrían de habilitarse—; y, todavía más, la misma
AMERICATEL reconoció en su demanda que la ampliación de capacidad de manejo de tráfico,
esto es, la habilitación de puertos E1 adicionales se haría **"a medida que creciera** el tráfico de
telecomunicaciones" (negrita suplida), es decir, AMERICATEL reconoció y admitió, en su
demanda, que si el tráfico de telecomunicaciones que se cursa en la ruta de interconexión entre
CTE y AMERICATEL no mostraba crecimiento o tendencia a ello, no era procedente la
aplicación del procedimiento para la ampliación de capacidad de manejo de tráfico en la
interconexión; o, dicho en otros palabras, *si no existía crecimiento del tráfico cursado a través
de la interconexión, no era procedente la habilitación de puertos E1 adicionales en la ruta de
interconexión.*

102.     Continuó CTE en su argumentación de la siguiente manera:

**A.   Contenido y Alcance del Número Romano VI del Anexo A del Contrato de Interconexión entre CTE y AMERICATEL**

103.     Señaló CTE que en romano VI del Anexo A del contrato de interconexión entre CTE y AMERICATEL, *no aparece consignada, de ningún modo, obligación alguna para CTE de habilitar puertos E1 adicionales de manera automática, por la mera petición de AMERICATEL*, sino que el referido romano VI del Anexo A es contundente al señalar que la ampliación de capacidad se dará sólo bajo el supuesto de cumplimiento de ciertas condiciones y hasta un límite máximo.

104.     Indicó CTE que, en realidad, el romano VI del Anexo A del contrato de interconexión entre CTE y AMERICATEL, regulaba un procedimiento específico para la ampliación de capacidad de manejo de tráfico en la interconexión, que bien reconoce AMERICATEL se aplica sólo cuando ha existido crecimiento en el tráfico de telecomunicaciones cursado en la ruta de interconexión. Dicho procedimiento quedaba sometido a los siguientes parámetros y condiciones:

> a)  que la habilitación de puertos E1 adicionales se haría "dentro de los parámetros considerados en el numeral romano V" (se refiere al romano V del Anexo A del Contrato de Interconexión);

> b)  que durante el primer año de vigencia del contrato, AMERICATEL no tenía derecho "ni a solicitar ni a obtener puertos adicionales a los que tenga a la fecha de la firma" del contrato;

> c)  que a partir del segundo año de vigencia del contrato, AMERICATEL podría requerir puertos E1 adicionales "únicamente una vez al año";

> d)  que los puertos E1 adicionales solicitados por AMERICATEL serían habilitados por CTE en el plazo máximo de 30 días (por supuesto, es patente entender que dicho plazo opera única y exclusivamente bajo el supuesto que es procedente la ampliación solicitada);

> d)  que el número de puertos E1 adicionales a habilitar serían "como máximo el diez por ciento (10%) de los puertos conectados y habilitados al momento de la solicitud hecha por" AMERICATEL.

105.     Dijo CTE que la remisión que el No. 1, letra a) del romano VI del Anexo hace al romano V del mismo Anexo A conduce a tomar en cuenta, para la ampliación de capacidad, dos parámetros de carácter técnico: la «completación» de llamadas y la probabilidad de pérdida; pero sobre todo obliga a referirse al párrafo 4° del romano V, en el cual se estipuló que *Para ampliar las capacidades de interconexión se procederá a dimensionar esta capacidad, para lo cual, ambas Partes se comprometen (...)*, lo que deja en evidencia, que, sin ninguna clase de dudas, que en el contrato de interconexión entre CTE y AMERICATEL se previó que la ampliación de

capacidad de manejo de interconexión exige, como requisito *sine qua non* (pues la redacción de la estipulación contractual está hecha en términos imperativos), *la previa realización de obligados análisis dimensionales que permitan establecer, en caso de proceder, la magnitud de la ampliación de capacidad*, esto es, determinar el número de puertos E1 adicionales a habilitar en caso que hubiere existido crecimiento del trafico telefónico cursado en la interconexión.

106.   Afirmó CTE que la necesidad y obligación de realización de análisis dimensionales –sentido en que las partes utilizaron la expresión «dimensionar»– coincide conceptual y lógicamente con la *fijación de un límite máximo en el número de puertos E1 adicionales que eventualmente correspondería habilitar cada año*, ya que al estipular una limitación cuantitativa en el número de puertos E1 adicionales a habilitar se evidencia que el procedimiento de ampliación de capacidad previó que si el resultado de los análisis dimensionales a efectuarse determinaran que el número de puertos E1 adicionales fuere mayor al 10% de puertos E1 habilitados al momento de la solicitud, la ampliación debía limitarse a dicho 10% (con la estipulación de la regla sobre aproximación al entero próximo superior en caso de fracción). Dicho en otras palabras: CTE y AMERICATEL acordaron que *el máximo* de puertos E1 adicionales a habilitar cada año, después del primer año de vigencia del contrato, sería el 10% de los puertos E1 habilitados a la fecha de la solicitud, por lo que, en lo que es una inferencia lógica imperativa, *si las partes han acordado un límite máximo de puertos E1 a habilitar cada año, para determinar el número exacto de puertos E1 a habilitar en un año concreto deben efectuarse los cálculos, y debe dimensionarse la ampliación de capacidad que correspondería para cada año.*

107.   Afirmó CTE que al concatenar el romano V con el romano VI, ambos del Anexo A del contrato de interconexión entre CTE y AMERICATEL, queda patente la estructura del procedimiento que acordaron las partes para la ampliación de capacidad de manejo de tráfico en la ruta de interconexión:

a)   Comprobación de crecimiento del tráfico cursado mediante la interconexión, conforme a las liquidaciones de tráfico;

b)   Solicitud por parte de AMERICATEL de habilitación de puertos E1 adicionales, después del primer año de vigencia del contrato y limitada una vez al año;

c)   Realización de los análisis dimensionales («dimensionamiento») para determinar la magnitud de la ampliación de capacidad, los que deben realizarse conforme a los parámetros del romano V;

d)   Determinación, como resultado de los análisis dimensionales, del número de puertos E1 que corresponde habilitar, observando la limitación del porcentaje máximo (10%) de puertos E1 adicionales a habilitar;

e)   Habilitación, en el plazo de 30 días, de los puertos E1 adicionales que los análisis dimensionales hayan determinado corresponde habilitar para la ampliación de capacidad de manejo de tráfico.

108.    Afirmó CTE que la comprensión que del procedimiento para la ampliación de capacidad de manejo de tráfico se ha expuesto, es conforme con las reglas que para la interpretación de los contratos prevé el Código Civil salvadoreño, aplicable en el presente arbitraje:

> a) *principio de conservación*, en el sentido que las cláusulas contractuales deben interpretarse de modo tal que produzcan efecto y es por tanto indispensable que tanto el acuerdo de previo «dimensionamiento» de la ampliación de capacidad como la naturaleza limitativa del porcentaje del 10%, como indicación de un máximo (palabra expresamente consignada en el texto del romano VI del Anexo A), se apliquen efectivamente, aspectos sobre los cuales, a decir de CTE, AMERICATEL omite hacer referencia, ya que de hacerlo quedaría en evidencia el sofisma al que ha recurrido para intentar, infructuosamente, sustentar su demanda;

> b) *principio de interpretación sistemática*, que dispone que debe atenderse a la naturaleza del contrato para la interpretación de sus cláusulas y, en consecuencia, ya que el contrato de interconexión es un convenio que tiene como finalidad posibilitar el flujo de telecomunicaciones entre las redes de los operadores interconectados y su esencia no radica en el otorgamiento de facilidades técnicas, la ampliación de capacidad debe apreciarse y analizarse de manera de permitir que se alcance la finalidad de la interconexión y no como un acuerdo sin impacto sobre el comportamiento del tráfico de telecomunicaciones; y

> c) *principio de interpretación integral*, que señala que las cláusulas contractuales no deben interpretarse aisladamente y de modo separado, sino en coherencia y consistencia con el resto de las estipulaciones y, en tal sentido, para CTE no es jurídicamente válida la alegación de AMERICATEL en tanto la misma se sustenta exclusivamente en una cita aislada e inconexa de una sola previsión contractual (el plazo de habilitación de los puertos E1 requeridos en caso de ampliación de capacidad) y obvia hacer mención de las estipulaciones contractuales sobre las exigencias de la observancia de condiciones y parámetros para el cálculo del *dimensionamiento* de la ampliación de capacidad de manejo de tráfico.

## B.   Estipulación Contractual e Intención de las Partes: Confirmación de Carácter no Automático de Ampliación de Capacidad de Manejo de Tráfico

109.    Afirmó CTE que la conclusión anterior, en el sentido que la ampliación de capacidad de manejo de tráfico no es un hecho que deba producirse en forma automática y por el mero transcurso del tiempo, se fortalece al considerar la intención de las partes, reflejada documentalmente en las distintas versiones de los textos de la estipulación contractual sobre ampliación de capacidad y, además, que se conoce por las declaraciones de testigos que participaron directamente en las negociaciones entre CTE y AMERICATEL tendentes a la firma del contrato de interconexión suscrito el 6 de febrero de 2003.

110.     Señaló CTE que sobre el proceso de formulación de las estipulaciones relativas a la ampliación de capacidad de manejo de tráfico, precisaba mencionar los siguientes antecedentes y eventos:

a) En el contrato de interconexión que a 2001 regía la relación comercial y técnica entre CTE y AMERICATEL se preveía, con relación a la determinación para la capacidad de manejo de tráfico a cursar por la interconexión, la remisión y ratificación de proyecciones de tráfico.

b) AMERICATEL no remitió, en el plazo contractualmente previsto, su ratificación de proyecciones de tráfico para 2002, por lo que no tenía derecho contractual a la ampliación de capacidad para ese momento.

c) Sin embargo, en un apoyo a AMERICATEL CTE, accedió a la habilitación de puertos E1 adicionales, ampliando la capacidad en la ruta de interconexión CTE—AMERICATEL.

d) El olvido, omisión o error de AMERICATEL motivó que AMERICATEL solicitara modificación al contrato entonces vigente, en el sentido que para acceder a una mayor ampliación de capacidad de manejo de tráfico planteó —y CTE aceptó— su renuncia a los descuentos por volumen que con relación al tráfico internacional entrante tenía conforme al contrato de 1997, por lo que se le otorgó la habilitación de 10 puertos E1 adicionales.

e) La referida omisión (no ratificar su proyección de tráfico para 2002) también condicionó que AMERICATEL insistiera, en el proceso de negociación que concluyó con el contrato de interconexión firmado el 6 de febrero de 2003, que debía acordarse un mecanismo que permitiera –de modo indefectible— que cada año se ampliara la capacidad de manejo de tráfico, que no fuera afectada por errores de sus propios empleados; planteando AMERICATEL, en el curso de tales negociaciones, que se fijara un número mínimo de puertos E1 a habilitarse cada año o se acordara un porcentaje que sobre la base de los puertos E1 habilitados garantizara la ampliación de capacidad, planteando una ampliación de capacidad de carácter automático.

f) La posición que CTE sostuvo en el transcurso de las negociaciones con relación a la propuesta de AMERICATEL es que la ampliación de capacidad debía efectuarse por la aplicación de métodos y parámetros técnicos que permitiesen el uso eficiente de los recursos, de modo tal que no estaba de acuerdo con una ampliación de capacidad que no estuviera técnicamente acreditada.

g) Así, dice CTE, AMERICATEL proponía, con relación a la estipulación sobre ampliación de capacidad de manejo de tráfico, que ésta debía consistir cada año en un aumento igual al 10% de la capacidad "conectada y habilitada al momento del requerimiento", ante lo que CTE planteó que la ampliación